UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | : | **CRIMINAL NO.:** |
| | : | |
| v. | : | |
| | : | **VIOLATIONS:** |
| **CRYOSTAR SAS,** | : | |
| | : | 18 U.S.C. § 371 |
| Defendant. | : | (Conspiracy) |
| | : | 50 U.S.C. §§ 1701-1706 |
| | : | (International Emergency Economic |
| | : | Powers Act) |
| | : | 31 C.F.R. Part 560 |
| | : | (Iranian Transactions Regulations) |
| | : | 18 U.S.C. § 2 |
| | : | (Aiding and Abetting, and Causing an |
| | : | Act to Be Done) |

**I N F O R M A T I O N**

The United States Attorney charges that:

**COUNT ONE**:
**Conspiracy**

At all times material to this Information:

**A. Defendant Cryostar SAS**

1.    Defendant **CRYOSTAR SAS (formerly Cryostar-France SA; hereinafter referred to as "CRYOSTAR")** was a French company, headquartered in Hesingue, France, where more than 200 employees worked. Defendant **CRYOSTAR** had business centers in various parts of the world, including an affiliate in the United States. Defendant **CRYOSTAR** specialized in the design and manufacturing of cryogenic equipment, such as pumps, turbines, compressors and automatic filling stations that were used to transport and process natural gases at extremely cold temperatures.

2.    Ebara International Corp., Inc. ("EBARA") was a Delaware corporation with its principal place of business in Nevada. EBARA engaged in the business of designing and

manufacturing cryogenic pumps for various uses, including for pumping fluid hydrocarbons that have been cooled to cryogenic temperatures (280 degrees below zero).

3.  "TN" was a French company with a U.S. subsidiary.

4.  In 2001, TN arranged to purchase cryogenic submersible pumps from EBARA for delivery to an Iranian company for installation at the 9th and 10th Olefin Petrochemical Complexes in Iran.

5.  Defendant **CRYOSTAR** agreed to facilitate this transaction by serving as the middleman for TN and Ebara, by purchasing the pumps from EBARA, by reselling them to TN (which forwarded the pumps to Iran), and by falsely indicating that the final purchaser was a French company that would install the pumps in France, when all parties to the transaction knew that the ultimate and intended destination of the pumps was Iran.

### B. The Licensing and Regulatory Structure

6.  The International Emergency Economic Powers Act ("IEEPA"), 50 U.S.C. §§ 1701-1706, authorized the President of the United States ("the President") to impose economic sanctions on a foreign country in response to an unusual or extraordinary threat to the national security, foreign policy or economy of the United States when the President declares a national emergency with respect to that threat.

7.  On March 15, 1995, the President issued Executive Order No. 12957 finding that "the actions and policies of the Government of Iran constitute an unusual and extraordinary threat to the national security, foreign policy, and economy of the United States" and declaring "a national emergency to deal with that threat." Executive Order No. 12957, as expanded and continued by Executive Order Nos. 12959 and 13059, was in effect at all times relevant to this Information.

8.  Executive Orders No. 12959 and 13059 (the "Executive Orders") imposed economic sanctions, including a trade embargo, on Iran. The Executive Orders prohibited, among other things, the exportation, reexportation, sale, or supply, directly or indirectly, to Iran of any goods, technology,

or services from the United States or by a United States person. The Executive Orders also prohibited any transaction by any United States person or within the United States that evaded or avoided, or had the purpose of evading or avoiding, any prohibition set forth in the Executive Orders.

### The Iranian Transactions Regulations

9. The Executive Orders authorized the United States Secretary of the Treasury, in consultation with the United States Secretary of State, "to take such actions, including the promulgation of rules and regulations, as may be necessary to carry out the purposes" of the Executive Orders. Pursuant to this authority, the Secretary of the Treasury promulgated the Iranian Transactions Regulations, 31 C.F.R. Part 560, implementing the sanctions imposed by the Executive Orders.

10. Under the Iranian Transactions Regulations, 31 C.F.R. Part 560:

   a. Section 560.204 provided that no goods, technology, or services may be exported, reexported, sold, or supplied to Iran, directly or indirectly, from the United States or by a United States person wherever located, without authorization. 31 C.F.R. § 560.204.

   b. Section 560.203 prohibited any transaction by any United States person or within the United States that evaded or avoided, or had the purpose of evading or avoiding, or that attempted to violate, any of the prohibitions set forth in Part 560. Section 560.203 further prohibited any attempt to violate the prohibitions contained in Part 560. 31 C.F.R. § 560.203.

**CRYOSTAR'S** export and attempted export to Iran of U.S. origin cryogenic submersible pumps were subject to the Iranian Transactions Regulations.

11. The United States Department of the Treasury's Office of Foreign Assets Control ("OFAC"), located in the District of Columbia, had responsibility for administering the Iranian Transactions Regulations, and was the entity empowered to authorize transactions with Iran during

the embargo. Such authorization, if granted, would be in the form of a license.

## C. The Conspiracy

12. From at least in or about August, 2001, and continuing through on or about May 18, 2004, the exact dates being unknown, defendant **CRYOSTAR** knowingly conspired and agreed with others known and unknown, within the District of Columbia, Nevada, and elsewhere, to commit offenses against the United States, that is:

   a. knowingly to fail to obtain from OFAC located in the District of Columbia, prior authorization required for the direct and indirect export to Iran of cryogenic submersible pumps intended for use in petrochemical plants;

   b. knowingly to export and cause to be exported from the United States to Iran cryogenic submersible pumps for use in Iranian petrochemical plants; and

   c. knowingly to conceal the export of cryogenic submersible pumps for petrochemical plants to Iran by transshipping the pumps through defendant **CRYOSTAR** to the purchasing company which would then forward the pumps to the petrochemical company in Iran without the requisite U.S. Government authorization and to make false and misleading statements to the United States Department of Commerce in relation to the export.

### Object of the Conspiracy

13. The object of the conspiracy was to profit from the export of cryogenic submersible pumps from the United States to Iran.

### Manner and Means Used to Accomplish the Object of the Conspiracy

14. The conspirators used the following manner and means, among others, to accomplish the object of the conspiracy:

   a. TN offered EBARA a substantial payment premium for exporting cryogenic pumps to Iran in violation of the export laws;

b.  The conspirators developed a plan to conceal the export of cryogenic pumps to Iran, under which EBARA would sell and export the pumps to defendant **CRYOSTAR** in France, which would then resell the pumps to TN, with the ultimate and intended destination being Iran;

c.  The conspirators set forth the plan on a "matrix," which they used as a roadmap, including various procedures to be followed by each company to protect their conduct from detection by United States law enforcement, which included the following:

   1) requiring that all paperwork be passed through the London office of EBARA which would eliminate references to Iran and TN on paperwork going to EBARA in the United States and which would replace EBARA references with the letterhead and template of defendant **CRYOSTAR** on engineering drawings, letters and reports on paperwork going to TN and Iran;

   2) creating false purchase orders

      i) from defendant **CRYOSTAR** to EBARA stating that defendant **CRYOSTAR**, not TN, was the purchaser, and France, not Iran, was the ultimate and intended destination and

      ii) from TN to defendant **CRYOSTAR** stating that defendant **CRYOSTAR**, not EBARA, was the supplier, and that France, not the United States, was the country of origin for the pumps;

   3) permitting only limited witness testing of the pumps in the United States by TN and not at all by the Iranian customer;

   4) transferring responsibility for all installation, commissioning, maintenance, testing, and training in Iran from EBARA to defendant **CRYOSTAR** and allowing participation by EBARA personnel from EBARA's London office

        only in "extreme situations" and no participation by EBARA personnel from the United States "under any circumstances;"

5)     omitting all EBARA labels and stamps on the pumps' component parts before export to conceal the true country of their origin;

6)     replacing EBARA labeling and stamping of the pumps' component parts and accompanying shipping documents with defendant **CRYOSTAR** identifiers after export to France so the country of their origin appeared to be France rather than the United States;

7)     purchasing as many component parts as possible from non-U.S. suppliers and importing them into the United States for assembly by EBARA to avoid using parts with U.S. certificates of origin and addressing questions from U.S. suppliers regarding end-users; and

8)     shipping the pumps from the United States through Canada, and then to France for re-labeling, before shipment to Iran for installation at the 9th Olefin Petrochemical Complex.

d.     The conspirators manufactured four pumps, and shipped them, in January 2003, for installation at the 9th Olefin Petrochemical Complex in Iran, (**"First CRYOSTAR Order"**), and prepared three additional pumps to be shipped to Iran in the fall of 2003, for installation at the 10th Olefin Petrochemical Complex in Iran (**"Second CRYOSTAR Order"**);

e.     The conspirators covered up their deceptive conduct by creating false correspondence confirming that the pumps were not sent to Iran; and

f.     None of the conspirators sought and obtained export licenses for the shipment to Iran.

**Overt Acts**

15. In furtherance of the conspiracy and to accomplish the objects of the conspiracy, defendant **CRYOSTAR** and other conspirators committed the following overt acts, among others, in the District of Columbia, Nevada, and elsewhere:

a. In or about August 2001, defendant **CRYOSTAR's** Deputy Managing Director, met with and corresponded with an EBARA employee to discuss transactions involving the sale of cryogenic pumps, the ultimate destination of which would be Iran.

b. On or about August 16, 2001, defendant **CRYOSTAR's** Deputy Managing Director sent an e-mail to EBARA agreeing to make an offer to TN, on behalf of EBARA, to supply four pumps for a site in Iran and agreeing to send **CRYOSTAR** letterhead to EBARA so that EBARA could place its technical and price data on **CRYOSTAR** letterhead for submission to TN.

c. On or about February 5, 2002, a **CRYOSTAR** employee sent an e-mail message to EBARA in which he attached the **CRYOSTAR** drawing template for the **First CRYOSTAR Order**.

d. On or about February 18, 2002, TN sent defendant **CRYOSTAR** a purchase order for the **First CRYOSTAR Order**, requesting four cryogenic submersible pumps, with a total value of 855,000 euros, that is, approximately $746,756, to be paid by TN to defendant **CRYOSTAR**.

e. On or about March 11, 2002, defendant **CRYOSTAR** sent EBARA a purchase order for the **First CRYOSTAR Order**, requesting four cryogenic submersible pumps, with a total value of 752,399 euros, that is, approximately $658,191, to be paid by defendant **CRYOSTAR**, which purchase order falsely identified the end-user as a company in Aubette, France.

f. On or about March 21, 2002, following procedures set out in the matrix, defendant **CRYOSTAR** sent EBARA an e-mail message from TN asking whether the client's

        nationality, *i.e.*, Iranian, would make it a problem to test the pumps in the United States, and then defendant **CRYOSTAR** received EBARA's response, so that it could put it on **CRYOSTAR** letterhead before forwarding it to TN.

g. On or about April 8, 2002, defendant **CRYOSTAR** sent a letter to TN that included as an attachment a signed and stamped order acknowledgment for the supply of cryogenic pumps for a site in Iran listing defendant **CRYOSTAR** as the supplier, rather than EBARA, the true supplier.

h. On or about July 23, 2002, EBARA sent defendant **CRYOSTAR** an invoice for the **First CRYOSTAR Order**, listing defendant **CRYOSTAR** as the purchaser (instead of TN, the true purchaser) and the destination of the pumps as France (instead of Iran).

i. On or about August 28, 2002, defendant **CRYOSTAR**, on behalf of TN, sent EBARA an initial payment of 75,240 euros, that is, approximately $72,253 at the time of receipt, representing 10% of the total purchase price for the **First CRYOSTAR Order**.

j. On September 20, 2002, purchaser TN issued defendant **CRYOSTAR** a purchase order for the **Second CRYOSTAR Order**, requesting three cryogenic pumps, valued at 1,140,000 euros, that is, approximately $1,125,055, for a site in Iran.

k. In or about September, 2002, defendant **CRYOSTAR**, on behalf of TN, sent EBARA a pre-payment of 102,885 euros, that is, approximately $100,953 at the time of receipt, representing 10% of the total purchase price for the **Second CRYOSTAR Order** of three pumps.

l. On October 31, 2002, defendant **CRYOSTAR** sent EBARA a purchase order for the **Second CRYOSTAR Order**, requesting three cryogenic submersible pumps, with a total value of 1,028,850 euros, that is approximately $1,012,800, to be paid by

|   |   |
|---|---|
|   | defendant **CRYOSTAR**, which purchase order falsely identified the end-user as a company in Aubette, France. |
| m. | On or about December 12, 2002, defendant **CRYOSTAR**, on behalf of TN, sent EBARA a second pre-payment of 225,720 euros, that is, approximately $223,756 at the time of receipt, representing 30% of the total purchase price for the **First CRYOSTAR Order**. |
| n. | On or about January 27, 2003, EBARA shipped, via California and Montreal, the **First CRYOSTAR Order** for delivery to France, with accompanying documents including the Bill of Lading listing defendant **CRYOSTAR** as the consignee. |
| o. | On or about March 13, 2003, fearing that the federal government had learned that EBARA had sold cryogenic pumps to Iran, EBARA began taking steps to cover-up the sales, including taking steps to warn defendant **CRYOSTAR** that a "cover-up" would be necessary. |
| p. | On or about March 17, 2003, EBARA's then-president faxed a "cover-up" letter to defendant **CRYOSTAR** seeking confirmation that the pumps supplied under the **First CRYOSTAR Order** were not installed in Iran, although both parties knew that the pumps were, in fact, sent to Iran. |
| q. | On or about March 17, 2003, EBARA's then-president faxed a second "cover-up" letter to defendant **CRYOSTAR** seeking confirmation that the pumps EBARA would supply under the **Second CRYOSTAR Order** would not be installed in Iran, although both parties knew that the pumps were, in fact, intended for Iran. |
| r. | On or about March 24, 2003, defendant **CRYOSTAR** sent an invoice to purchaser TN for pumps supplied under the **First CRYOSTAR Order**. |
| s. | On or about March 25, 2003, defendant **CRYOSTAR** responded to EBARA's first "cover-up" letter by sending a purchase order which falsely stated that the pumps |

        were installed in France.

t.     On or about April 2, 2003, defendant **CRYOSTAR** sent an e-mail to EBARA advising that the **First CRYOSTAR Order** of four pumps, consisting of 16 boxes, had been shipped to TN.

u.     On April 9, 2003, EBARA held a "pre-inspection" meeting for the **Second CRYOSTAR Order** at its Nevada plant, which was attended by a **CRYOSTAR-USA** employee.

v.     On April 9, 2003, defendant **CRYOSTAR** responded to EBARA's second "cover-up" letter by sending a purchase order which falsely stated that the pumps for the **Second CRYOSTAR Order** were to be installed at a site in France.

w.     On or about August 21, 2003, defendant **CRYOSTAR**, on behalf of TN, sent EBARA a payment of 376,199 euros, that is, approximately $416,603 at the time of receipt, representing 50% of the total purchase price for the **First CRYOSTAR Order**.

x.     On or before August 27, 2003, EBARA prepared the **Second CRYOSTAR Order** for export in the fall of 2003.

y.     When interviewed by Department of Commerce agents on or about May 18, 2004, **CRYOSTAR** employees claimed that they had believed EBARA had obtained the necessary export licenses to complete the sale and delivery of cryogenic pumps to Iran, knowing that EBARA had, in fact, not done so.

(**Conspiracy to Commit Offenses Against the United States**, in violation of Title 18, United States Code, Section 371).

## COUNT TWO
### Export Without an Export License

1. Paragraphs One through Four of Count One of this Information are re-alleged and incorporated as if set out in full herein.

2. On or about January 27, 2003, within the District of Columbia, Nevada, and elsewhere, defendant **CRYOSTAR** and others did knowingly and willfully export and cause to be exported from the United States to Iran four cryogenic pumps without obtaining an export license from the United States Department of the Treasury or any other agency located in the District of Columbia.

(**Export Without an Export License**, in violation of Title 50, United States Code, Sections 1701-1706; Title 31, Code of Federal Regulations Part 560; **Aiding and Abetting and Causing an Act to Be Done**, Title18, United States Code, Section 2).

## COUNT THREE
### Attempted Export Without an Export License

1. Paragraphs One through Four of Count One of this Information are re-alleged and incorporated as if set out in full herein.

2. On or before August 27, 2003, within the District of Columbia, Nevada, and elsewhere, defendant **CRYOSTAR** and others did knowingly and willfully attempt to export and cause to be exported from the United States to Iran three cryogenic pumps without obtaining an export license from the United States Department of the Treasury or any other agency located in the District of Columbia.

(**Attempted Export Without an Export License**, in violation of Title 50, United States Code, Sections 1701-1706; Title 31, Code of Federal Regulations Part 560; **Aiding and Abetting and Causing an Act to Be Done**, Title18, United States Code, Section 2).

                    JEFFREY A. TAYLOR
                    United States Attorney
                    for the District of Columbia
                    D.C. Bar No. 498610

By:          /s/
        Jonathan M. Malis
        D.C. Bar No. 454548
        Assistant United States Attorney
        National Security Section
        United States Attorney's Office
        555 4th Street, N.W.
        Washington, D.C. 20530
        (202) 305-9665
        Jonathan.M.Malis@usdoj.gov

Dated: March 24, 2008