UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | CRIMINAL NO.: 08-79(CKK) |
| | : | |
| v. | : | Sentencing: July 17, 2008 |
| | : | |
| CRYOSTAR SAS, | : | |
| | : | |
| Defendant. | : | |

## MEMORANDUM IN SUPPORT OF RULE 11(c)(1)(C) PLEA AND SENTENCING

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this memorandum in support of its recommendation that the Court accept the parties' written plea agreement pursuant to Federal Rule of Criminal Procedure 11(c)(1)(C) and sentence defendant CRYOSTAR SAS ("CRYOSTAR"), to a criminal fine of $500,000 and corporate probation of two years.

## PROCEDURAL BACKGROUND

1. On April 10, 2008, pursuant to a written plea agreement with the United States, the defendant, through its organizational representative Daniel Meyer, pled guilty to three felony counts contained in a criminal Information, charging defendant CRYOSTAR with conspiracy, in violation of 18 U.S.C. § 371 (Count One), and an illegal export and an attempted illegal export, in violation of the International Emergency Economic Powers Act ("IEEPA"), 50 U.S.C. §§ 1701-1706, and the relevant provisions of the Iranian Transactions Regulations, 31 C.F.R. Part 560 (Counts Two and Three, respectively).

2. Pursuant to the plea agreement, the defendant, through Mr. Meyer, admitted its guilt to the offense conduct described in the factual proffer attached to that agreement.

3. Pursuant to Rule 11(c)(1)(C) the plea agreement provides for an agreed-upon sentence

of a criminal fine of $500,000, and corporate probation of two years. The plea agreement provides that the defendant must pay the criminal fine at the time of sentencing.

4. The plea agreement provides for a two-year term of corporate probation. In addition to any other conditions of probation that the United States Probation Office may propose and/or the Court may impose, the plea agreement provides for the following conditions of probation: (1) the defendant shall pay the sum set forth in the agreement; and (2) pursuant to 18 U.S.C. § 3563(a)(1), the defendant shall not commit any federal, state or local crimes during the term of probation.

5. The plea agreement also refers to the civil fine and other civil sanctions that have been imposed on the defendant by the Department of Commerce for the conduct that gave rise to the criminal charges. Pursuant to a separate agreement between the defendant and the United States Department of Commerce, the defendant agreed to pay an administrative fine of $66,000 and agreed to the entry of a two-year order denying the defendant export privileges, which order was immediately suspended.

6. The Court deferred formal acceptance of the plea agreement until the date of the sentencing hearing.

**STIPULATED OFFENSE CONDUCT**

7. From at least August 2001 and through May 18, 2004, defendant CRYOSTAR knowingly conspired and agreed with others to export cryogenic submersible pumps from the United States to Iran without obtaining an export license from the United States Department of the Treasury or any other agency in the District of Columbia, as required by law. Defendant CRYOSTAR was a French company, headquartered in Hesingue, France, with business centers in various parts of the world, including an affiliate in the United States. Defendant CRYOSTAR specialized in the design

and manufacturing of cryogenic equipment, such as pumps, turbines, compressors and automatic filling stations that were used to transport and process natural gases at extremely cold temperatures.

8.  Ebara International Corp., Inc. ("EBARA") was a Delaware corporation with its principal place of business in Nevada. EBARA engaged in the business of designing and manufacturing cryogenic pumps for various uses, including for pumping fluid hydrocarbons that have been cooled to cryogenic temperatures (280 degrees below zero).

9.  "TN" was a French company with a U.S. subsidiary.

10. In 2001, TN arranged to purchase cryogenic submersible pumps from EBARA for delivery to an Iranian company for installation at the 9th and 10th Olefin Petrochemical Complexes in Iran.

11. Defendant CRYOSTAR agreed to facilitate this transaction by serving as the intermediary between TN and Ebara, by purchasing the pumps from EBARA, by reselling them to TN (which forwarded the pumps to Iran), and by falsely indicating that the final purchaser was a French company that would install the pumps in France, when all parties to the transaction knew that the ultimate and intended destination of the pumps was Iran.

12. Defendant CRYOSTAR and its conspirators developed procedures to be followed by each company to protect their conduct from detection by United States law enforcement, which procedures were set forth in a document referred to as the "matrix."

13. Defendant CRYOSTAR and its conspirators manufactured four pumps, and shipped them, in January 2003, for installation at the 9th Olefin Petrochemical Complex in Iran ("First CRYOSTAR Order"). The conspirators prepared three additional pumps to be shipped to Iran in the fall of 2003, for installation at the 10th Olefin Petrochemical Complex in Iran ("Second CRYOSTAR

Order").

14.   Among other things, defendant CRYOSTAR took the following steps to further this criminal conspiracy:

   a.   On March 11, 2002, defendant CRYOSTAR, on behalf of TN, sent EBARA a purchase order for the First CRYOSTAR Order, requesting four cryogenic submersible pumps, with a total value of approximately $658,191, to be paid by defendant CRYOSTAR, which purchase order falsely identified the end-user as a company in Aubette, France.

   b.   On April 8, 2002, defendant CRYOSTAR sent a letter to TN that included as an attachment a signed and stamped order acknowledgment for the supply of cryogenic pumps for a site in Iran listing defendant CRYOSTAR as the supplier, rather than EBARA, the true supplier.

   c.   On August 28, 2002, defendant CRYOSTAR, on behalf of TN, sent EBARA an initial payment of approximately $72,253 at the time of receipt, representing 10% of the total purchase price for the First CRYOSTAR Order.

   d.   In September, 2002, defendant CRYOSTAR, on behalf of TN, sent EBARA a pre-payment of approximately $100,953 at the time of receipt, representing 10% of the total purchase price for the Second CRYOSTAR Order.

   e.   On October 31, 2002, defendant CRYOSTAR, on behalf of TN, sent EBARA a purchase order for the Second CRYOSTAR Order, requesting three cryogenic submersible pumps, with a total value of approximately $1,012,800, to be paid by defendant CRYOSTAR, which purchase order falsely identified the end-user as a company in Aubette, France.

   f.   On December 12, 2002, defendant CRYOSTAR, on behalf of TN, sent EBARA a second pre-payment of approximately $223,756 at the time of receipt, representing 30%

of the total purchase price for the First CRYOSTAR Order.

   g. In March 2003, responding to EBARA's fear that the United States federal government had learned of the export of cryogenic pumps to Iran, EBARA and defendant CRYOSTAR attempted to cover up their conduct by creating false correspondence purporting to "confirm" that the pumps were not sent to Iran.

   h. On March 24, 2003, defendant CRYOSTAR sent an invoice to purchaser TN for pumps supplied under the First CRYOSTAR Order.

   i. On August 21, 2003, defendant CRYOSTAR, on behalf of TN, sent EBARA a payment of approximately $416,603 at the time of receipt, representing 50% of the total purchase price for the First CRYOSTAR Order.

   j. On August 27, 2003, EBARA prepared the Second CRYOSTAR Order for export in the fall of 2003.

   k. When interviewed by Department of Commerce agents on May 18, 2004, CRYOSTAR employees claimed that they had believed EBARA had obtained the necessary export licenses to complete the sale and delivery of cryogenic pumps to Iran, knowing that EBARA had, in fact, not done so.

## CRIMINAL HISTORY

15. Consistent with the Pre-Sentence Report, the United States has no information that the defendant has engaged in similar misconduct or other misconduct.

## MAXIMUM STATUTORY PENALTIES AND SENTENCING GUIDELINES

16. For each of Counts One, Two, and Three, pursuant to 18 U.S.C. § 3571(c)(3), the defendant, as a corporate violator, faces a maximum penalty of $500,000 (for a combined maximum

criminal fine of $1,500,000). The defendant is also subject to a term of corporate probation of five years pursuant to 18 U.S.C. § 3561. In addition, pursuant to 18 U.S.C. § 3013(a)(2)(B), the defendant must pay the mandatory special assessment of $1,200 to the Clerk of the United States District Court at the time of sentencing.

17.     As provided in the Pre-Sentence Report, the United States Sentencing Guidelines do not apply to this case, because the applicable guideline, USSG § 2M5.1(a), is not listed under USSG § 8C2.1, which governs fines for organizations. Therefore, pursuant to USSG § 8C2.10, the sentence is determined by applying 18 U.S.C. §§ 3553 and 3572.

## RELATED CASES

18.     On September 23, 2004, EBARA pled guilty to two counts of conspiracy to violate the export control laws, three substantive counts of export violations, and two counts of money laundering before Judge John Garrett Penn. The offenses to which EBARA pled guilty included the criminal conspiracy involving defendant CRYOSTAR, but also encompassed unrelated violations of the export control laws. On December 7, 2004, pursuant to the terms of a Rule 11(c)(1)(C) plea agreement, Judge Penn sentenced EBARA to a criminal fine of $6.3 million and three years of corporate probation.

19.     Also on September 23, 2004, Everett Hylton, the former Chief Executive Officer and Chairman of the Board of EBARA, pled guilty to one count of conspiracy to make false statements in connection with the criminal conspiracy involving defendant CRYOSTAR. On December 7, 2004, pursuant to the terms of a Rule 11(c)(1)(C) plea agreement, Judge Penn sentenced Hylton to a criminal fine of $10,000 and three years of probation.

**PLEA AND SENTENCING RECOMMENDATION**

20.     The Court should accept the parties' written plea agreement pursuant to Rule 11(c)(1)(C) and sentence the defendant to a criminal fine of $500,000 and two years of corporate probation.

21.     The plea agreement is a fair resolution of this case. The agreement gives the defendant the full benefit of its acceptance of responsibility, by providing it with a lesser criminal fine than the Court might otherwise impose after indictment, trial, and conviction. The agreement also benefits the United States, because it avoids the expense, time, and risk associated with trial by jury.

22.     The agreed-upon sentence also reflects defendant CRYOSTAR's role in the conspiracy relative to EBARA. Defendant CRYOSTAR served as an intermediary between EBARA and TN. These were EBARA's pumps that were being exported to Iran for TN's Iranian customer. Defendant CRYOSTAR played a limited, albeit critical, role in facilitating this criminal scheme. In light of the $6.3 million criminal fine imposed on EBARA for its role in this conspiracy and other, unrelated criminal conduct, the lower fine to be imposed here appropriately reflects defendant CRYOSTAR's relative culpability.

23.     The plea agreement is also appropriate in light of the overall resolution of this case. Combined with the separate agreement with the United States Department of Commerce, the defendant is required: (1) to pay a total penalty of $566,000 (criminal and administrative); (2) to remain on criminal probation for two years; and (3) to remain on "administrative probation" for two years, with the severe sanction of losing its export privileges as further incentive to ensure compliance with all export control law requirements.

WHEREFORE, the government respectfully requests that the Court accept the parties' plea agreement pursuant to Rule 11(c)(1)(C) and sentence the defendant to a criminal fine of $500,000 and two years of probation.

Respectfully submitted,

JEFFREY A. TAYLOR
United States Attorney
for the District of Columbia
D.C. Bar No. 498610

By: _____/s/_____
Jonathan M. Malis
D.C. Bar No. 454548
Assistant United States Attorney
National Security Section
(202) 305-9665
Jonathan.M.Malis@usdoj.gov

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a copy of the foregoing was caused to be served via the Court's Electronic Case Filing system on counsel of record on this 2nd day of July, 2008.

_____/s/_____
Jonathan M. Malis
Assistant United States Attorney